IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

MARTIN ANTHONY LESTER,

    Plaintiff,

v.                                                      CIVIL ACTION NO. 5:19-cv-00509

ANDREW SAUL,
Commissioner of Social Security,

    Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Martin Anthony Lester ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. By standing order entered on January 4, 2016, and filed in this case on July 11, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Memorandum in Support of Judgment on the Pleadings (ECF No. 9) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 11).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I. BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 52 years old at the time of his alleged disability onset date and 55 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. at 38.)[1] He is a high school graduate. (*Id.* at 281.) He worked as a worksite supervisor for low-income housing for around twenty years. (*Id.*) Claimant alleges that he became disabled on June 4, 2016, due to ringing in both ears, chronic obstructive pulmonary disease, two heart attacks with stent placement, spinal arthritis, history of blood clots in both legs, asthma, fatigue, anxiety, and depression. (*Id.* at 280.)

Claimant protectively filed his DIB application on July 25, 2016, and his SSI application on July 26, 2016. (*Id.* at 258–68.) His claims were initially denied on December 30, 2016, and again upon reconsideration on June 9, 2017. (*Id.* at 171–80, 182–95.) Thereafter, on June 30, 2017, Claimant filed a written request for hearing. (*Id.* at 196–97.) An administrative hearing was held before an ALJ on November 29, 2018, in Bluefield, West Virginia, with the ALJ appearing from Charleston, West Virginia. (*Id.* at 34–56.) On February 22, 2019, the ALJ entered an unfavorable decision. (*Id.* at 14–33.) Claimant then sought review of the ALJ's decision by the Appeals Council on March 7, 2019. (*Id.* at 253–57.) The Appeals Council denied Claimant's request for review on May 13, 2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.

2

Claimant timely brought the present action on July 10, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 7) and a transcript of the administrative proceedings (ECF No. 8). Claimant subsequently filed his Memorandum in Support of Judgment on the Pleadings (ECF No. 9), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 11). As such, this matter is fully briefed and ready for resolution.

B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1. *Evidence Related to Claimant's Cardiac Conditions*

On October 16, 2014, Claimant's cardiologist referred him to his vascular surgeon "for evaluation of his severe right internal carotid artery stenosis." (Tr. at 731.) The cardiologist related that Claimant "recently underwent coronary stenting" but "is stable from the cardiac point of view." (*Id.*) He also noted that Claimant "appears to be asymptomatic with his carotid disease." (*Id.*) Claimant's vascular surgeon evaluated him on October 21, 2014, and testing revealed "high grade right proximal and mid internal carotid artery stenosis." (*Id.* at 732.) Claimant underwent a right carotid endarterectomy on October 30, 2014. (*Id.* at 733.)

On June 2, 2015, Claimant presented to his primary care provider for a refill on his medications. (*Id.* at 363.) Upon physical examination, his heart rate and rhythm were observed to be normal, and no wheezing was heard. (*Id.*) He returned to his primary care provider for a follow-up appointment on October 13, 2015. (*Id.* at 370.) He reported no

3

chest pain or discomfort and no heart palpitations, and he related that he was not experiencing shortness of breath or wheezing. (*Id.*) The physical examination findings related to his heart and lungs were normal. (*Id.* at 370–71.) He was counseled on regular exercise and proper diet. (*Id.* at 371.) Upon physical examination at his next appointment with his primary care provider on January 7, 2016, Claimant's heart and lungs were normal. (*Id.* at 375.)

On March 21, 2016, Claimant presented to his cardiologist and reported having "atypical chest pain" and shortness of breath upon exertion. (*Id.* at 408.) It was noted that Claimant's blood pressure was controlled. (*Id.*) The physical findings related to Claimant's heart and lungs were normal, and his cardiology provider believed that his chest pain was not cardiac in nature. (*Id.* at 409.) The provider recommended that Claimant continue his medication regimen and counseled Claimant on "the importance of compliance with diet, medications and exercise, along with avoiding direct and indirect exposure to tobacco products." (*Id.* at 410.) Claimant was instructed to follow up in six months. (*Id.*)

On August 16, 2016, Claimant presented to his primary care provider and reported that he had experienced pain in his "left lower chest" earlier that day but was not experiencing chest discomfort at that time. (*Id.* at 389.) Upon physical examination, Claimant's heart and lungs were normal. (*Id.* at 389–90.) His primary care provider ordered cardiac testing and referred Claimant to his cardiologist. (*Id.* at 391.) Claimant's electrocardiogram was "[b]orderline." (*Id.* at 397.) He saw his cardiology provider on August 22, 2016, and reported "a left anterior breast pressure" that "occurs at rest with no precipitating or relieving factors" and "lasted all day." (*Id.* at 404.) Claimant also complained of shortness of breath upon exertion. (*Id.*) It was noted that his blood

4

pressure was controlled. (*Id.*) Claimant's provider ordered an echocardiogram and a treadmill stress test to rule out ischemia. (*Id.* at 406.) Claimant was once again counseled about diet, medication compliance, exercise, and tobacco cessation. (*Id.*) The echocardiogram was conducted on September 2, 2016, and the results "show[ed] normal function with mild valvular disease." (*Id.* at 402–03, 487.) Claimant underwent the treadmill stress test on September 15 2016, and it was "[n]egative . . . for ischemia." (*Id.* at 400.) Claimant's cardiology provider recommended that he follow up in six months. (*Id.* at 489.)

Claimant presented to his primary care provider for medication refills on November 7, 2016. (*Id.* at 520.) Upon physical examination, his heart and lungs were normal. (*Id.*) He was counseled on diet, exercise, and tobacco use. (*Id.* at 521.) He returned to his primary care provider on December 29, 2016. (*Id.* at 517.) The physical findings associated with his heart and lungs were again normal, and he was again counseled on diet, exercise, and tobacco use. (*Id.* at 517–18.)

On March 28, 2017, Claimant presented to his cardiologist for a follow-up appointment. (*Id.* at 484.) It was noted that Claimant "appears to be doing fairly well cardiac wise" and was "is fairly active and asymptomatic." (*Id.* at 484, 486.) He was instructed to continue his medications and counseled on cardiac risk modification. (*Id.* at 486.)

Imaging of Claimant's chest conducted on May 16, 2017, revealed no evidence of pulmonary nodules or masses, but there was evidence of atherosclerotic vascular disease and "bilateral nonobstructing renal calculi." (*Id.* at 572.) Claimant underwent a carotid ultrasound on May 24, 2017, that revealed stenosis of less than 10%. (*Id.* at 529.)

5

Claimant presented to his primary care provider on August 1, 2017, for medication refills. (*Id.* at 596.) Upon physical examination, his heart and lungs were normal. (*Id.*)

On October 25, 2017, Claimant returned to his cardiologist for a follow-up appointment. (*Id.* at 567.) He told his cardiology provider that his vascular surgeon told him "that his carotid disease and peripheral vascular disease were stable." (*Id.* at 569.) Claimant was directed to continue his medications, and his provider stated, "There is no need for further cardiac evaluation." (*Id.*) Specifically, Claimant's cardiologist ruled out conducting a stress test because Claimant was not experiencing cardiac symptoms. (*Id.*)

Claimant presented to his primary care provider on February 27, 2018, for refills of his medication. (*Id.* at 609.) The physical findings related to his heart and lungs were normal. (*Id.*)

Claimant was evaluated by his cardiologist on April 30, 2018, in preparation for a dental surgical procedure. (*Id.* at 613.) It was noted that Claimant "is active and asymptomatic" and "is tolerating his medications well without any side effects." (*Id.* at 614.) Claimant's cardiology provider again stated, "There is no need for further cardiac evaluation." (*Id.*) The provider believed there was no cardiac risk for Claimant's dental surgical procedure. (*Id.*) Claimant was directed to continue his medication. (*Id.*)

On May 31, 2018, Claimant returned to his primary care provider for medication refills. (*Id.* at 620.) Upon physical examination, his heart and lungs were normal. (*Id.* at 621.) When he presented to his primary care provider requesting refills of his medication on September 4, 2018, the physical findings associated with his heart and lungs were again normal. (*Id.* at 755–56.)

In preparation for a medical procedure associated with kidney stones, Claimant presented to his cardiologist on October 24, 2018, for an evaluation. (*Id.* at 770.)

Claimant underwent a stress test, which was negative for ischemia, but a myocardial perfusion scan was "[a]bnormal" and indicated a 36% ejection fraction, which Claimant's cardiology provider "thought to be under-estimated." (*Id.* at 771, 775.) Claimant then underwent a follow-up echocardiogram that revealed a higher ejection fraction of 50%. (*Id.*) His cardiology provider noted that he "is active and asymptomatic" and "is tolerating his medications very well without side effects." (*Id.* at 772.) Claimant was directed to continue his medication regimen without the "need for further cardiac evaluation." (*Id.*) He was approved to undergo the procedure for his kidney stones. (*Id.*)

### C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),

416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and

8

internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

9

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through December 31, 2018. (Tr. at 20.) She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (*Id.*) She found that Claimant's coronary artery disease, osteoarthritis, degenerative disc disease, and degenerative joint disease of the knees constituted "severe" impairments. (*Id.* at 20–22.) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 22.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able

"to perform medium work . . . except he can frequently climb ramps and stairs," "occasionally climb ladders, ropes or scaffolds," and "frequently balance, stoop, kneel, and crouch but only occasionally crawl." (*Id.* at 22–23.) She further found that Claimant "can tolerate frequent exposure to extreme cold, wetness, fumes, odors, dusts, gases, and poor ventilation." (*Id.* at 23.)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was able to perform his past relevant work as a building maintenance repairer as generally performed. (*Id.* at 26.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from June 4, 2016, through the date of this decision." (*Id.*)

## II. LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled,"

this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III. ANALYSIS

Claimant argues that the ALJ's RFC assessment failed to adequately account for the limitations caused by his coronary artery disease, an impairment the ALJ found to be severe. (ECF No. 9 at 4–8.) Claimant asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 8.) The Commissioner responds that Claimant failed to meet his burden to show that he was incapable of performing his past work and that the ALJ adequately explained her treatment of Claimant's coronary artery disease in her RFC assessment. (ECF No. 11 at 6–11.)

"In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Stated another way, "the ALJ must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis deleted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

Here, the ALJ began her RFC assessment by summarizing Claimant's allegations about his impairments and his hearing testimony, and she specifically mentioned that Claimant testified about experiencing fatigue as a result of his cardiac procedures. (Tr. at 23.) But she concluded that Claimant's subjective complaints were inconsistent with the record evidence, explaining with regard to Claimant's cardiac impairments that objective findings during the relevant period were largely unremarkable, and his providers continually noted that he was asymptomatic and his cardiac condition was stable. (*Id.* at 24–25.) She observed that "the medical record reflects improved cardiovascular symptoms with medication" and that Claimant's "treatment has been conservative with no extended hospitalizations." (*Id.* at 25.) She also summarized Claimant's self-reported daily activities. (*Id.*)

To the extent Claimant challenges the ALJ's evaluation of his subjective complaints, the ALJ sufficiently explained her findings and permissibly discounted Claimant's allegations. *See Ladda*, 749 F. App'x at 170 (upholding ALJ's credibility determination because ALJ "explained his reasoning and weighed [claimant's] subjective statements against other evidence"). And although Claimant argues that the ALJ failed to address his "complaints of constant fatigue since his stent placement" (ECF No. 9 at 6), Claimant's cardiology provider's treatment notes state that the causes of his fatigue, daytime somnolence, and snoring were "multifactorial" and appear to suggest that those symptoms were consistent with sleep apnea, not a cardiac condition (Tr. at 405, 409, 485, 488, 568, 613, 772). The crux of the ALJ's analysis with respect to Claimant's cardiac conditions is that the record evidence demonstrated no ongoing difficulties nor sustained effects on Claimant's everyday functioning that required additional RFC limitations.

This is supported by the "[g]reat weight" the ALJ assigned to the opinions of the state-agency medical consultants that Claimant "could perform a reduced range of medium work with frequent posturals but with the occasional climbing of ladders, ropes, or scaffolds." (Tr. at 25.) The ALJ explained that their opinions "are consistent with [Claimant's] generally unremarkable cardiovascular findings," among other evidence. (*Id.*) The ALJ is entitled to rely on the state-agency medical consultants' opinions if she explains her reasons for doing so and if the opinions are consistent with the record evidence. *See Brumfield v. Colvin*, No. 3:14-10719, 2015 WL 1482285, at *8 (S.D.W. Va. Mar. 31, 2015); *see also Lester v. Berryhill*, No. 2:17-cv-04376, 2018 WL 4956532, at *25 (S.D.W. Va. Sept. 21, 2018), *adopted by* 2018 WL 4956122 (Oct. 12, 2018). Importantly, Claimant does not take issue with the weight the ALJ accorded to those opinions. (*See* ECF No. 9.)

However, Claimant argues that the ALJ insufficiently explained her reasons for departing from the conclusions of the ALJ who evaluated Claimant's RFC in connection with a prior DIB application and found that he was capable of performing only light work due to his coronary artery disease. (*Id.* at 6–7.) Claimant contends that the prior ALJ also cited Claimant's improved cardiac condition in formulating Claimant's RFC yet found him more limited than the present ALJ found him to be. (*Id.*) Where, as here, a claimant has filed a previous application for benefits and had his claim adjudicated by an ALJ, the ALJ adjudicating the claimant's subsequent claim for benefits must consider the prior ALJ's findings "as evidence and give [them] 'appropriate' weight in light of the attendant facts and circumstances." *Tucker v. Colvin*, No. 0:15-cv-03750-RBH, 2017 WL 382429, at *3 (D.S.C. Jan. 27, 2017); *see McCray v. Colvin*, No. 1:15-cv-951, 2017 WL 65830, at *1 (M.D.N.C. Jan. 6, 2017) ("[A]n ALJ is required to consider findings from a prior final

decision of the Commissioner in making a disability determination for a subsequent application that covers an unadjudicated time period." (citing *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 477–78 (4th Cir. 1999))); *Johnson v. Colvin*, No. 3:15-cv-296 (REP), 2016 WL 626378, at *3 (E.D. Va. Jan. 27, 2016) ("[A]n ALJ must consider as evidence the findings made in a final decision by an ALJ or the Appeals Council on a prior disability claim." (citing SSAR 00-1(4), 2000 WL 43774 (Jan. 12, 2000))), *adopted by* 2016 WL 631071 (E.D. Va. Feb. 16, 2016). In doing so, the ALJ must essentially determine how the record evidence developed since the prior ALJ's findings bears on the continued validity of those findings. *See* SSAR 00-1(4), 2000 WL 43774, at *4 (listing factors to consider).

The ALJ assigned "partial weight" to the prior ALJ's findings, reasoning that while they were "consistent with the overall record at that time, the current medical record does not reflect that [Claimant] is as limited as the prior decision states." (Tr. at 25.) She pointed to Claimant's negative stress test[2] and normal echocardiogram conducted in September 2016, shortly after the prior ALJ's June 2016 decision; his normal pulmonary function test from December 2016; and his "generally normal family medicine records" during the relevant period to support her conclusion. (*Id.*) And she had already discussed

---

[2] Claimant suggests that the ALJ "mischaracterized" his October 2017 stress test as "negative" to support her findings. (ECF No. 9 at 7.) However, the ALJ was clearly referring to Claimant's stress test from September 2016 in her analysis: she cited to Exhibit B2F, which contains records from Claimant's cardiologist for the period between March 21, 2016, and September 15, 2016, including the results of a September 15, 2016 stress test that Claimant's cardiologist indeed described as "[n]egative." (Tr. at 25, 400.) Claimant did not have a stress test in October 2017; rather, his cardiologist expressly declined to conduct one because Claimant was "asymptomatic." (*Id.* at 569.) The "abnormal" result to which Claimant seemingly refers relates to an October 24, 2018 stress test, which Claimant's cardiologist also stated was "[n]egative." (*Id.* at 775.) A myocardial perfusion scan performed that same day was deemed "[a]bnormal" and "suggestive of moderate size inferior wall myocardial infarction with ejection fraction of 36%." (*Id.*) Claimant's cardiologist stated that the low number "was thought to be under-estimated" (*id.*), and a follow-up echocardiogram "reveal[ed] an ejection fraction of 50%" (*id.* at 771). In other words, the medical records suggest that the "abnormal" result was an error, and the ALJ quoted from the record when stating that the October 2018 stress test was negative. She plainly did not mischaracterize the evidence.

15

earlier in her RFC assessment that Claimant's more recent cardiac-related objective findings were "unremarkable" and that his condition was "stable." (*Id.* at 24–25.) Put simply, the ALJ determined that the continued stability of Claimant's cardiac conditions necessitated fewer RFC restrictions than the prior ALJ had found. By considering the previous ALJ's findings and explaining why they were not fully adopted, the ALJ did precisely what is required. *See McCray*, 2017 WL 65830, at *2 ("In determining Plaintiff's RFC and rendering the ultimate disability determination, the most recent ALJ gave 'careful consideration of the entire record[,]' including . . . consideration of 'the findings from the prior ALJ decision' and medical treatment records from the time period subsequent to the prior ALJ's decision." (internal citations omitted)).

As such, the undersigned **FINDS** that the ALJ properly conducted the RFC assessment as it relates to Claimant's coronary artery disease.

## IV. CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and

Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Volk.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: June 2, 2020

Dwane L. Tinsley
United States Magistrate Judge